1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                           SAN FRANCISCO DIVISION

10

11    JESUS ANTONIO PONCE,                    No. C 09-5730 RS

12                    Petitioner,             **ORDER DENYING PETITION FOR
                                              HABEAS CORPUS**
         v.

13

14    KELLY HARRINGTON, Warden

15                    Respondent.

16    _____/

17

                                  I. INTRODUCTION

18

19        This is a federal habeas corpus action filed by *pro se* state prisoner Jesus Antonio Ponce

20    pursuant to 28 U.S.C. § 2254.  For the reasons set forth below, the petition will be denied.

21

                                  II. BACKGROUND

22

23        On the evening of November 4, 2004, Luis Contreras and his girlfriend hosted a party.

24    Those in attendance included Miguel Hernandez, Jesus Yuriar, and Ponce, all of whom were

25    members of the West Side San Mateo gang ("WSSM").  WSSM is part of a larger street gang

26    known as the Norteños.  WSSM and the Norteños identify with the color red and the number 14.

27    The Sureños, a rival street gang and perceived enemy to the Norteños, identify with the color blue

28

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1   and the number 13.  That night, Ponce wore a predominantly red San Francisco 49ers jersey and

2   Hernandez wore a red shirt.

3          At some time during the party, Yuriar drove Contreras, Hernandez, and Ponce to a liquor

4   store to purchase more alcohol.  While Contreras and Hernandez entered the store, Ponce and Yuriar

5   waited in the car in front of the store.  Shortly thereafter, Jaime Meza, the eventual victim, also

6   arrived at the liquor store.  Meza wore a blue plaid shirt and a blue canvas belt.  The colors worn by

7   Meza were not intended to be significant, as he had no gang affiliations.

8          As Meza walked towards the entrance, Ponce approached and asked him what gang he

9   "claimed."  Meza stated that he claimed nothing and that he was just returning home from work.

10  Ponce asked Meza three more times what he claimed.  Meza repeated "nothing" each time.  Meza

11  and Ponce both entered the liquor store.

12         Upon purchasing the alcohol and exiting the store, Yuriar spoke with Ponce about "checking

13  out" Meza.  Yuriar and petitioner were then joined by Hernandez.  As Meza left the store and

14  walked towards his car, Ponce approached Meza and asked twice more what Meza claimed.  Again,

15  Meza responded that he claimed nothing and that he was on his way home from work.  Ponce asked

16  Meza two or three times to show his belt.  Meza replied that he did not want any trouble.  Ponce

17  responded by kicking Meza in the hip.  Meza did not fight back, and got into his car.  Ponce and

18  Hernandez held Meza's car door open.  Hernandez hit Meza in the face one or two times; Ponce hit

19  Meza in the face one time.  Again, Meza did not fight back.  Meza eventually was able to close his

20  door and start the car.

21         At the same time, Yuriar drove his car behind Meza's car and blocked it.  Hernandez told

22  Ponce, "Let's go, it's over."  Hernandez and Ponce started to walk towards Yuriar's car.  As

23  Hernandez started to open Yuriar's car door, Meza backed his car up, pinning Hernandez between

24  the two cars for approximately five to ten seconds.

25         Conflicting testimony was offered at trial regarding Hernandez's response to being pinned.

26  Hernandez testified that he screamed when Meza's car hit him and that he believed that his legs

27  were broken.  He was able to walk immediately afterwards, however, and never sought medical

28  attention.  Contreras testified that Hernandez did not scream and simply made a facial expression as

2

1  if he were in pain. Another witness testified that after Hernandez was hit, he simply kicked Meza's
2  car and moved out of the way.

3       Meza moved his car forward after hitting Hernandez.  According to Contreras, Meza
4  appeared frightened.  Ponce pulled out a gun, ran towards Meza's car, and fired three or four shots
5  through the driver's side window from a distance of approximately three to six feet.  Meza backed
6  his car up and started to drive away.  Ponce then ran behind Meza's car and fired additional shots.
7  Yuriar, who had driven off with Hernandez, then returned to pick up Ponce and Contreras, who had
8  run off in a separate direction upon the initial firing of shots.  When getting in the car, Contreras
9  asked Ponce if he had used a BB gun.  Ponce responded that he had used a real gun.  When
10 questioned why, Ponce replied, "I couldn't see my homeboy get hit like that" or "I couldn't see
11 Miguel get smashed."

12      Hernandez testified that he did not know that Ponce had a gun with him.  Contreras testified
13 to the same effect, and also asserted that the group had no plans to look for Sureño gang members
14 that night.  Meza died of multiple gunshot wounds.

15      Five days after the shooting, San Mateo police officers executed a search warrant at Ponce's
16 house and discovered, among other things, a CD containing explicit gang lyrics.  Over defense
17 counsel's objection, the court admitted transcripts of the CD's third track and played it for the jury.
18 Gang expert, San Mateo Police Detective Rick Deckler, testified regarding the lyrics and the history
19 of the Mexican Mafia and the Nuestra Familia prison gangs.  Defense counsel conceded in opening
20 statement that Ponce was a WSSM gang member.  During trial, the prosecution referred to Ponce as
21 a "Norteño gang banger" multiple times.  Defense counsel offered no objection to the use of the
22 term.  Additionally, the prosecution analogized Ponce's conduct to that of a Ku Klux Klan member
23 killing a black man or a neo-Nazi skinhead killing a Jewish person.  Defense counsel again did not
24 object.

25      A jury found Ponce guilty of first degree murder.  Additionally, the jury found that Ponce
26 personally used a firearm in commission of the offense, that the murder was carried out in
27 furtherance of the activities of a criminal street gang, and that it was committed for the benefit of a
28 criminal street gang.  Ponce was sentenced to life without the possibility of parole, with a

1   consecutive term of twenty-five years to life.  The California Court of Appeal affirmed the

2   judgment, and the California Supreme Court denied review.

3

4                                           III. LEGAL STANDARD

5          This court may entertain a petition for writ of habeas corpus "in behalf of a person in

6   custody pursuant to the judgment of a State court only on the ground that he is in custody in

7   violation of the Constitution or laws or treaties of the United States." 28 U.S .C. § 2254(a). The

8   petition may not be granted with respect to any claim that was adjudicated on the merits in state

9   court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary

10  to, or involved an unreasonable application of, clearly established Federal law, as determined by the

11  Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable

12  determination of the facts in light of the evidence presented in the State court proceeding." 28

13  U.S.C. § 2254(d). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the

14  state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of

15  law or if the state court decides a case differently than [the] Court has on a set of materially

16  indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000).

17          "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if

18  the state court identifies the correct governing legal principle from [the] Court's decisions but

19  unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[A] federal

20  habeas court may not issue the writ simply because that court concludes in its independent judgment

21  that the relevant state-court decision applied clearly established federal law erroneously or

22  incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. A federal habeas court

23  making the "unreasonable application" inquiry should ask whether the state court's application of

24  clearly established federal law was "objectively unreasonable." *Id*. at 409.  An unreasonable

25  application of federal law differs from an incorrect application of federal law.  *Harrington v.*

26  *Richter*, 131 S. Ct. 770, 785 (2011).  Thus, habeas corpus is "not a substitute for ordinary error

27  correction through appeal."  *Id.* at 786.  Instead, the "highly deferential standard" imposed by the

28

United States District Court
For the Northern District of California

statute, "demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

IV. DISCUSSION

A. Imperfect defense of others

Ponce's trial counsel urged the court to give an imperfect defense of others instruction, contending there was evidence from which the jury could have reasonably concluded that Ponce actually, but unreasonably, believed Hernandez was in imminent danger at the time Ponce fired the fatal shots. The trial court determined that the instruction was not applicable, and declined to give it.

The Supreme Court has held that "[a] defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988). The mere refusal of a trial court to provide an instruction to a jury, however, does not necessarily raise a ground cognizable in a federal habeas corpus proceeding. *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988). The error must "so infect the entire trial that the defendant was deprived of his right to a fair trial guaranteed by the due process clause of the fourteenth amendment." *Id.* Further, a state trial court's finding that an imperfect defense of others is unwarranted is entitled to "a presumption of correctness on federal habeas review." *Menendez v. Terhune*, 422 F.3d 1012, 1029 (discussing imperfect self-defense). Thus, a habeas petitioner "whose claim involves a failure to give a particular instruction bears an 'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)).

Here, Ponce has failed to meet that burden. While an honest, but unreasonable, belief that it is necessary to defend oneself from immediate peril to life or great bodily injury satisfies a claim of an imperfect self-defense, *In re Christian S.*, 7 Cal. 4th 768, 788, Ponce points to no evidence sufficient to show that an imperfect self-defense of others instruction was warranted. As an explanation for the shooting, Ponce stated, "I couldn't see my homeboy get hit like that" or "I couldn't see Miguel get smashed." Such assertions undermine any contention Ponce actually feared

5

that Hernandez was in imminent danger.  Further, Hernandez testified that Meza drove forward to release him from between the two cars.  Petitioner did not begin shooting until after Meza moved his car forward.  This indicates that any peril Ponce may have perceived from Hernandez being pinned had already ceased by the time petitioner fired at the victim.  Prospective danger or fear of danger "in the near future" does not constitute imminent peril.  *Id.* at 783  ("Fear of future harm-no matter how great the fear and no matter how great the likelihood of the harm-will not suffice.")  An actual fear of imminent harm must be present to satisfy an imperfect self-defense.  *Id.*  Because Ponce has failed to show there was evidence from which a jury could have reasonably concluded he acted from actual fear of imminent danger, there was no constitutional error in the trial court's failure to instruct the jury on an imperfect defense of others.

Further, even if such a constitutional error was established, federal habeas relief would only be appropriate if the flaw in the instruction "had substantial and injurious effect in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).  This is not the case here.  As the California Court of Appeal correctly noted in affirming the trial court's judgment, the jury manifested its rejection of defense counsel's claim that Ponce was "trying to help his friend."  The jury found Ponce guilty of first degree murder for the benefit of a criminal street gang in furtherance of the activities of his gang.  Such a finding leaves "no doubt the jury would have returned the same verdict had it been instructed regarding imperfect self-defense." *People v. Manriquez*, 37 Cal. 4th 547, 582 (2005).   Thus, the claimed instructional error had no substantial and injurious effect on the jury verdict.

B. Heat of passion

In a closely related claim, Ponce contends the trial court erred in declining his request that the jury be instructed on "heat of passion."  Again, to obtain federal habeas relief, Ponce must show both (1) constitutional error in the failure to instruct the jury as to "heat of passion"; and (2) resulting "substantial and injurious effect." *Brecht*, 507 U.S. at 623.

Here, petitioner has failed on both accounts.  A heat of passion defense consists of "the unlawful killing of a human being without malice aforethought 'upon a sudden quarrel or heat of

passion.'" *People v. Cole*, 33 Cal. 4th 1158, 1215 (2004) (citation omitted).  Such a defense

includes both an objective and a subjective component.  *Id.*  First, the defendant actually must have

killed under the heat of passion, viewed subjectively.  *Id.*  Additionally, however, the circumstances

claimed to have given rise to heat of passion must be evaluated objectively.  *Id.*  The defense applies

only where passion would "naturally be aroused in the mind of an ordinarily reasonable person

under the given facts and circumstances because no defendant may set up his own standard of

conduct and justify or excuse himself because in fact his passions were aroused." *Id.* (internal

quotations omitted).  This reasonable person standard requires, among other things, "provocation by

the victim."  *Id.* at 1216.

In denying habeas relief to Ponce, the California Court of Appeal noted that Meza's only

provocative act was to wear a blue shirt and blue belt.  There was no evidence that Meza

intentionally hit Hernandez when he tried to back up his car.   Even assuming Ponce could have

perceived that as an intentional act, such that he might have been acting under a subjective "heat of

passion," there is no evidence that Meza's conduct would have aroused the passion of an ordinarily

reasonable person.  Defense counsel conceded as much during closing arguments, admitting that

"Mr. Meza did nothing wrong.  There is no evidence before you whatsoever that he provoked Mr.

Ponce in any way.  This was an illegal attack."   Accordingly, it was not error to refuse a separate

instruction on heat of passion.

Furthermore, even assuming any error, federal habeas relief would still be inappropriate

because Ponce has not demonstrated any resulting substantial and injurious effect.  *See Brecht*, 507

U.S. at 623. Prior to deliberation, the jury was instructed that "[i]f you find that the killing was

preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which

was the result of deliberation and premeditation, so that it must have been formed upon pre-existing

reflection and not under a sudden heat of passion or other condition precluding the idea of

deliberation, it is murder of the first degree."  Given this instruction, the jury still found Ponce guilty

of first degree murder, thereby rejecting his claim that he acted only in immediate response to

Hernandez being pinned.  Ponce has not demonstrated how any additional separate instruction

regarding the heat of passion would have potentially led to a different result.

C. Evidence to support a first degree murder conviction

Ponce contends the evidence was insufficient to support a first degree murder conviction. More specifically, he claims that there was no evidence of planning activity, motive, or a manner of killing, to suggest premeditation and deliberation.  Under California law, it is presumed that an unjustified killing of another person is second degree murder.  *People v. Anderson*, 70 Cal. 2d 15, 25 (1968) (emphasis in original) (citing *People v. Hillery*, 62 Cal. 2d 692, 703 (1965)).  To establish a killing in the first degree, evidence must be introduced that provides a "*reasonable foundation* for an inference of premeditation and deliberation." *Id.*  According to the California Supreme Court (1) planning activity; (2) motive; and (3) manner of killing, are all relevant factors in determining whether a homicide included premeditation and deliberation.  *People v. Anderson*, 70 Cal. 2d 15, 32 (1968).

Ponce undisputedly brought a loaded, concealed weapon with him to a liquor store.  That conduct alone tends to support a finding of sufficient planning activity, as it gives rise to a reasonable inference that Ponce "considered the possibility of murder in advance and intended to kill." *People v. Young*, 34 Cal. 4th 1149, 1183 (2005) (internal quotations omitted) (stating that a defendant's planned entry into a house with a loaded gun could lead a jury to infer that "defendant considered the possibility of murder in advance and intended to kill.").  Further, Ponce was a self-identified WSSM gang member affiliated with the Norteños.  The intense rivalry between Sureño and Norteño gangs suggest that a motive existed for the killing of the victim, perceived to be a Sureño.  Finally, Ponce fired multiple times at the victim.  After firing the first round of shots, Ponce effectively chased after Meza's car to fire additional shots.  This manner of killing suggests a sufficient amount of deliberation necessary to warrant a finding of first degree murder.  *See People v. Wells*, 199 Cal App. 3d 535, 541 (1988) (stating that defendant's act of running after victim and firing three additional bullets provided strong evidence of premeditation and deliberation); *see also People v. Perez,* 2 Cal. 4th 1117, 1127 (1992) (holding that "premeditation can occur in a brief period of time").

Ponce asserts that the only reasonable conclusion to be drawn from the facts presented is that the shooting was the direct result of Hernandez being struck, and thus the requisite premeditation

United States District Court

For the Northern District of California

1   and deliberation necessary to support a first degree murder conviction are lacking.  In support of

2   this, Ponce points out the shooting immediately followed the incident in which Meza backed his car

3   into Hernandez.  Ponce further argues that the confrontation over gang identification was over by

4   the time the shooting began.  A reasonable jury could conclude from the evidence, however, that

5   the initial confrontation and the shooting were not, in fact, separate events.  Although Ponce had

6   walked away from the victim after kicking and hitting him, the undisputed facts show that he was

7   walking towards a car that blocked the victim's departure.  In light of the fact that the victim lacked

8   an escape route, a reasonable jury could conclude that Ponce maintained control over the situation

9   and that the confrontation had not yet ended.

10      Indeed, the first degree murder conviction demonstrates the jury rejected Ponce's

11   characterization of the events.  Even if the evidence might also have supported an inference that the

12   killing was not deliberate and premeditated, that does not preclude the contrary conclusion. It is the

13   duty of the jury to acquit a defendant if the evidence supports two separate interpretations of guilt

14   and innocence.  *See People v. Perez*, 2 Cal. 4th 1117, 1124 (1992).  If, however, "the circumstances

15   reasonably justify the trier of fact's findings, the opinion of the reviewing court that the

16   circumstances might also be reasonably reconciled with a contrary finding does not warrant a

17   reversal of the judgment."  *Id.*  Federal courts determine only whether "after viewing the evidence in

18   the light most favorable to the prosecution, *any* rational trier of fact could have found the essential

19   elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)

20   (emphasis in original).  Ponce failed to show a reasonable jury could not have found the requisite

21   degree of premeditation and deliberation on the evidence presented at trial.

22

23      D. Admission of particular gang evidence

24      Ponce claims that the admission of evidence about the Norteño gang violated his fair trial

25   and due process rights.  Ponce argues that the admission of CD lyrics and testimony about the

26   Nuestra Familia and Mexican Mafia were irrelevant to the disputed issues in the case, since his

27   counsel admitted his gang affiliation in opening arguments.  The further evidence, Ponce contends,

28   "infused the trial with unfairness."  The trial court disagreed, explaining that the lyrics from the CD

had probative value in that they demonstrated the general murderous intent of Norteño gang members.  In affirming the trial court decision, the California Court of Appeal observed that the lyrics provided the jury with insight into Ponce's mental state and reasons as to why he would use a loaded gun on a perceived Sureño.

Federal habeas relief would be available only if the admission of the CD lyrics and the testimony regarding the Nuestra Familia and Mexican Mafia were such that it rendered Ponce's trial "so fundamentally unfair as to violate due process."  *Windham v. Merkle*, 163 F.3d 1092, 1103 (1998).  Here, Ponce's claims of a fundamentally unfair trial fall flat.  First, testimony regarding the Nuestra Familia and the Mexican Mafia were relevant in that they provided a contextual historical background concerning the petitioner's criminal street gang and its rival counterpart.  That background was relevant to the understanding of Ponce's alleged motive in killing a suspected rival gang member.  Second, admission of CD lyrics containing specific reference to the killing of Sureños by Norteños provided further relevant insight into the contentious gang rivalry and Ponce's potential motivations.  Accordingly, Ponce's right to a fair trial and due process were not violated by the admission of evidence regarding the Norteño gangs.  *See United States v. Abel*, 469 U.S. 45, 49 (1984) (holding evidence regarding the "attributes" and "tenets" of a particular organization, as well as evidence of defendant's and witness's membership in the organization, to be relevant and admissible, where motivations in issue).

E. Ineffective assistance of counsel

Ponce contends that his constitutional right to effective assistance of counsel was violated when his trial attorney failed to object to the testimony regarding the Mexican Mafia and the Nuestra Familia.  Ponce makes additional claims relating to counsel's failure to object to the prosecutor's characterization of him as a "gang banger," and use of analogies to Ku Klux Klan members and Neo-Nazi skinheads.

This Court's scrutiny of trial counsel's performance must be "highly deferential."  *Strickland v. Washington*, 466 U.S. 668, 689 (1984).  To establish ineffective assistance of counsel, a petitioner must prove that trial counsel's performance fell below an objective standard of reasonableness.  *Id.*

*United States District Court*
For the Northern District of California

**United States District Court**
For the Northern District of California

1  at 687.   It is not enough merely to show deficient performance.  *Id.*   A petitioner must show that

2  the deficient performance was such that it prejudiced the defense.  *Id.* at 694.  This requires

3  establishing that but for trial counsel's deficient performance, the jury conviction would have been

4  different.  *Id.*

5        Here, Ponce has failed to meet the standard set forth in *Strickland*.  First, Ponce has not

6  shown that trial counsel's performance fell below an objective standard of reasonableness.  Counsel

7  must be given wide latitude in making tactical decisions.  *Id.* at 689.  Strategically, counsel may

8  have refrained from objecting so as not to appear desperate or hyper-technical.  *See United States v.*

9  *Molina*, 934 F.2d 1440, 1448 (9th Cir. 1991) (stating that "[f]rom a strategic perspective . . . many

10  trial lawyers refrain from objecting during closing arguments to all but the most egregious

11  misstatements by opposing counsel on the theory that the jury may construe their objections to be a

12  sign of desperation or hyper-technicality").  Such strategic choices do not rise to deficient

13  performance that would support an ineffective assistance claim.

14        Even if such a deficient performance had been established, Ponce has not demonstrated

15  prejudice.  It cannot be said that trial counsel's failure to object would have resulted in a different

16  result.  As such, Ponce's rights were not violated.

17

18                                      V. CONCLUSION

19        The state courts' adjudication of the claims did not result in a decision that was contrary to,

20  or involved an unreasonable application of, clearly established federal law, nor did it result in a

21  decision that was based on an unreasonable determination of the facts in light of the evidence

22  presented in the state court proceeding. Accordingly, the petition is DENIED.

23        A certificate of appealability will not issue. Reasonable jurists would not "find the district

24  court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S.

25  473, 484 (2000). Petitioner may seek a certificate of appealability from the Court of Appeals. The

26  Clerk shall enter judgment in favor of respondents and close the file.

27

28

11

1   IT IS SO ORDERED.

2

3   Dated:  9/14/12

                            RICHARD SEEBORG

4                              UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California