IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

JESUS ANTONIO PONCE,

        Petitioner,

  v.

KELLY HARRINGTON, Warden

        Respondent.

No. C 09-5730 RS

**ORDER DENYING PETITION FOR HABEAS CORPUS**

## I. INTRODUCTION

This is a federal habeas corpus action filed by *pro se* state prisoner Jesus Antonio Ponce pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the petition will be denied.

## II. BACKGROUND

On the evening of November 4, 2004, Luis Contreras and his girlfriend hosted a party. Those in attendance included Miguel Hernandez, Jesus Yuriar, and Ponce, all of whom were members of the West Side San Mateo gang ("WSSM"). WSSM is part of a larger street gang known as the Norteños. WSSM and the Norteños identify with the color red and the number 14. The Sureños, a rival street gang and perceived enemy to the Norteños, identify with the color blue

1  and the number 13. That night, Ponce wore a predominantly red San Francisco 49ers jersey and
2  Hernandez wore a red shirt.

3  At some time during the party, Yuriar drove Contreras, Hernandez, and Ponce to a liquor
4  store to purchase more alcohol. While Contreras and Hernandez entered the store, Ponce and Yuriar
5  waited in the car in front of the store. Shortly thereafter, Jaime Meza, the eventual victim, also
6  arrived at the liquor store. Meza wore a blue plaid shirt and a blue canvas belt. The colors worn by
7  Meza were not intended to be significant, as he had no gang affiliations.

8  As Meza walked towards the entrance, Ponce approached and asked him what gang he
9  "claimed." Meza stated that he claimed nothing and that he was just returning home from work.
10 Ponce asked Meza three more times what he claimed. Meza repeated "nothing" each time. Meza
11 and Ponce both entered the liquor store.

12 Upon purchasing the alcohol and exiting the store, Yuriar spoke with Ponce about "checking
13 out" Meza. Yuriar and petitioner were then joined by Hernandez. As Meza left the store and
14 walked towards his car, Ponce approached Meza and asked twice more what Meza claimed. Again,
15 Meza responded that he claimed nothing and that he was on his way home from work. Ponce asked
16 Meza two or three times to show his belt. Meza replied that he did not want any trouble. Ponce
17 responded by kicking Meza in the hip. Meza did not fight back, and got into his car. Ponce and
18 Hernandez held Meza's car door open. Hernandez hit Meza in the face one or two times; Ponce hit
19 Meza in the face one time. Again, Meza did not fight back. Meza eventually was able to close his
20 door and start the car.

21 At the same time, Yuriar drove his car behind Meza's car and blocked it. Hernandez told
22 Ponce, "Let's go, it's over." Hernandez and Ponce started to walk towards Yuriar's car. As
23 Hernandez started to open Yuriar's car door, Meza backed his car up, pinning Hernandez between
24 the two cars for approximately five to ten seconds.

25 Conflicting testimony was offered at trial regarding Hernandez's response to being pinned.
26 Hernandez testified that he screamed when Meza's car hit him and that he believed that his legs
27 were broken. He was able to walk immediately afterwards, however, and never sought medical
28 attention. Contreras testified that Hernandez did not scream and simply made a facial expression as

if he were in pain. Another witness testified that after Hernandez was hit, he simply kicked Meza's car and moved out of the way.

Meza moved his car forward after hitting Hernandez. According to Contreras, Meza appeared frightened. Ponce pulled out a gun, ran towards Meza's car, and fired three or four shots through the driver's side window from a distance of approximately three to six feet. Meza backed his car up and started to drive away. Ponce then ran behind Meza's car and fired additional shots. Yuriar, who had driven off with Hernandez, then returned to pick up Ponce and Contreras, who had run off in a separate direction upon the initial firing of shots. When getting in the car, Contreras asked Ponce if he had used a BB gun. Ponce responded that he had used a real gun. When questioned why, Ponce replied, "I couldn't see my homeboy get hit like that" or "I couldn't see Miguel get smashed."

Hernandez testified that he did not know that Ponce had a gun with him. Contreras testified to the same effect, and also asserted that the group had no plans to look for Sureño gang members that night. Meza died of multiple gunshot wounds.

Five days after the shooting, San Mateo police officers executed a search warrant at Ponce's house and discovered, among other things, a CD containing explicit gang lyrics. Over defense counsel's objection, the court admitted transcripts of the CD's third track and played it for the jury. Gang expert, San Mateo Police Detective Rick Deckler, testified regarding the lyrics and the history of the Mexican Mafia and the Nuestra Familia prison gangs. Defense counsel conceded in opening statement that Ponce was a WSSM gang member. During trial, the prosecution referred to Ponce as a "Norteño gang banger" multiple times. Defense counsel offered no objection to the use of the term. Additionally, the prosecution analogized Ponce's conduct to that of a Ku Klux Klan member killing a black man or a neo-Nazi skinhead killing a Jewish person. Defense counsel again did not object.

A jury found Ponce guilty of first degree murder. Additionally, the jury found that Ponce personally used a firearm in commission of the offense, that the murder was carried out in furtherance of the activities of a criminal street gang, and that it was committed for the benefit of a criminal street gang. Ponce was sentenced to life without the possibility of parole, with a

consecutive term of twenty-five years to life. The California Court of Appeal affirmed the judgment, and the California Supreme Court denied review.

### III. LEGAL STANDARD

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S .C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412–13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id*. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id*. at 409. An unreasonable application of federal law differs from an incorrect application of federal law. *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). Thus, habeas corpus is "not a substitute for ordinary error correction through appeal." *Id.* at 786. Instead, the "highly deferential standard" imposed by the

statute, "demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

## IV. DISCUSSION

### A. Imperfect defense of others

Ponce's trial counsel urged the court to give an imperfect defense of others instruction, contending there was evidence from which the jury could have reasonably concluded that Ponce actually, but unreasonably, believed Hernandez was in imminent danger at the time Ponce fired the fatal shots. The trial court determined that the instruction was not applicable, and declined to give it.

The Supreme Court has held that "[a] defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews v. United States*, 485 U.S. 58, 63 (1988). The mere refusal of a trial court to provide an instruction to a jury, however, does not necessarily raise a ground cognizable in a federal habeas corpus proceeding. *See Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988). The error must "so infect the entire trial that the defendant was deprived of his right to a fair trial guaranteed by the due process clause of the fourteenth amendment." *Id.* Further, a state trial court's finding that an imperfect defense of others is unwarranted is entitled to "a presumption of correctness on federal habeas review." *Menendez v. Terhune*, 422 F.3d 1012, 1029 (discussing imperfect self-defense). Thus, a habeas petitioner "whose claim involves a failure to give a particular instruction bears an 'especially heavy burden.'" *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)).

Here, Ponce has failed to meet that burden. While an honest, but unreasonable, belief that it is necessary to defend oneself from immediate peril to life or great bodily injury satisfies a claim of an imperfect self-defense, *In re Christian S.*, 7 Cal. 4th 768, 788, Ponce points to no evidence sufficient to show that an imperfect self-defense of others instruction was warranted. As an explanation for the shooting, Ponce stated, "I couldn't see my homeboy get hit like that" or "I couldn't see Miguel get smashed." Such assertions undermine any contention Ponce actually feared

that Hernandez was in imminent danger.  Further, Hernandez testified that Meza drove forward to release him from between the two cars.  Petitioner did not begin shooting until after Meza moved his car forward.  This indicates that any peril Ponce may have perceived from Hernandez being pinned had already ceased by the time petitioner fired at the victim.  Prospective danger or fear of danger "in the near future" does not constitute imminent peril.  *Id.* at 783  ("Fear of future harm-no matter how great the fear and no matter how great the likelihood of the harm-will not suffice.")  An actual fear of imminent harm must be present to satisfy an imperfect self-defense.  *Id.*  Because Ponce has failed to show there was evidence from which a jury could have reasonably concluded he acted from actual fear of imminent danger, there was no constitutional error in the trial court's failure to instruct the jury on an imperfect defense of others.

Further, even if such a constitutional error was established, federal habeas relief would only be appropriate if the flaw in the instruction "had substantial and injurious effect in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993).  This is not the case here.  As the California Court of Appeal correctly noted in affirming the trial court's judgment, the jury manifested its rejection of defense counsel's claim that Ponce was "trying to help his friend."  The jury found Ponce guilty of first degree murder for the benefit of a criminal street gang in furtherance of the activities of his gang.  Such a finding leaves "no doubt the jury would have returned the same verdict had it been instructed regarding imperfect self-defense."  *People v. Manriquez*, 37 Cal. 4th 547, 582 (2005).   Thus, the claimed instructional error had no substantial and injurious effect on the jury verdict.

### B. Heat of passion

In a closely related claim, Ponce contends the trial court erred in declining his request that the jury be instructed on "heat of passion."  Again, to obtain federal habeas relief, Ponce must show both (1) constitutional error in the failure to instruct the jury as to "heat of passion"; and (2) resulting "substantial and injurious effect." *Brecht*, 507 U.S. at 623.

Here, petitioner has failed on both accounts.  A heat of passion defense consists of "the unlawful killing of a human being without malice aforethought 'upon a sudden quarrel or heat of

1  passion.'" *People v. Cole*, 33 Cal. 4th 1158, 1215 (2004) (citation omitted). Such a defense
2  includes both an objective and a subjective component. *Id.* First, the defendant actually must have
3  killed under the heat of passion, viewed subjectively. *Id.* Additionally, however, the circumstances
4  claimed to have given rise to heat of passion must be evaluated objectively. *Id.* The defense applies
5  only where passion would "naturally be aroused in the mind of an ordinarily reasonable person
6  under the given facts and circumstances because no defendant may set up his own standard of
7  conduct and justify or excuse himself because in fact his passions were aroused." *Id.* (internal
8  quotations omitted). This reasonable person standard requires, among other things, "provocation by
9  the victim." *Id.* at 1216.

10  In denying habeas relief to Ponce, the California Court of Appeal noted that Meza's only
11  provocative act was to wear a blue shirt and blue belt. There was no evidence that Meza
12  intentionally hit Hernandez when he tried to back up his car. Even assuming Ponce could have
13  perceived that as an intentional act, such that he might have been acting under a subjective "heat of
14  passion," there is no evidence that Meza's conduct would have aroused the passion of an ordinarily
15  reasonable person. Defense counsel conceded as much during closing arguments, admitting that
16  "Mr. Meza did nothing wrong. There is no evidence before you whatsoever that he provoked Mr.
17  Ponce in any way. This was an illegal attack." Accordingly, it was not error to refuse a separate
18  instruction on heat of passion.

19  Furthermore, even assuming any error, federal habeas relief would still be inappropriate
20  because Ponce has not demonstrated any resulting substantial and injurious effect. *See Brecht*, 507
21  U.S. at 623. Prior to deliberation, the jury was instructed that "[i]f you find that the killing was
22  preceded and accompanied by a clear, deliberate intent on the part of the defendant to kill, which
23  was the result of deliberation and premeditation, so that it must have been formed upon pre-existing
24  reflection and not under a sudden heat of passion or other condition precluding the idea of
25  deliberation, it is murder of the first degree." Given this instruction, the jury still found Ponce guilty
26  of first degree murder, thereby rejecting his claim that he acted only in immediate response to
27  Hernandez being pinned. Ponce has not demonstrated how any additional separate instruction
28  regarding the heat of passion would have potentially led to a different result.

7

### C. Evidence to support a first degree murder conviction

Ponce contends the evidence was insufficient to support a first degree murder conviction. More specifically, he claims that there was no evidence of planning activity, motive, or a manner of killing, to suggest premeditation and deliberation. Under California law, it is presumed that an unjustified killing of another person is second degree murder. *People v. Anderson*, 70 Cal. 2d 15, 25 (1968) (emphasis in original) (citing *People v. Hillery*, 62 Cal. 2d 692, 703 (1965)). To establish a killing in the first degree, evidence must be introduced that provides a "*reasonable foundation* for an inference of premeditation and deliberation." *Id.* According to the California Supreme Court (1) planning activity; (2) motive; and (3) manner of killing, are all relevant factors in determining whether a homicide included premeditation and deliberation. *People v. Anderson*, 70 Cal. 2d 15, 32 (1968).

Ponce undisputedly brought a loaded, concealed weapon with him to a liquor store. That conduct alone tends to support a finding of sufficient planning activity, as it gives rise to a reasonable inference that Ponce "considered the possibility of murder in advance and intended to kill." *People v. Young*, 34 Cal. 4th 1149, 1183 (2005) (internal quotations omitted) (stating that a defendant's planned entry into a house with a loaded gun could lead a jury to infer that "defendant considered the possibility of murder in advance and intended to kill."). Further, Ponce was a self-identified WSSM gang member affiliated with the Norteños. The intense rivalry between Sureño and Norteño gangs suggest that a motive existed for the killing of the victim, perceived to be a Sureño. Finally, Ponce fired multiple times at the victim. After firing the first round of shots, Ponce effectively chased after Meza's car to fire additional shots. This manner of killing suggests a sufficient amount of deliberation necessary to warrant a finding of first degree murder. *See People v. Wells*, 199 Cal App. 3d 535, 541 (1988) (stating that defendant's act of running after victim and firing three additional bullets provided strong evidence of premeditation and deliberation); *see also People v. Perez,* 2 Cal. 4th 1117, 1127 (1992) (holding that "premeditation can occur in a brief period of time").

Ponce asserts that the only reasonable conclusion to be drawn from the facts presented is that the shooting was the direct result of Hernandez being struck, and thus the requisite premeditation

8

1  and deliberation necessary to support a first degree murder conviction are lacking. In support of
2  this, Ponce points out the shooting immediately followed the incident in which Meza backed his car
3  into Hernandez. Ponce further argues that the confrontation over gang identification was over by
4  the time the shooting began. A reasonable jury could conclude from the evidence, however, that
5  the initial confrontation and the shooting were not, in fact, separate events. Although Ponce had
6  walked away from the victim after kicking and hitting him, the undisputed facts show that he was
7  walking towards a car that blocked the victim's departure. In light of the fact that the victim lacked
8  an escape route, a reasonable jury could conclude that Ponce maintained control over the situation
9  and that the confrontation had not yet ended.

10  Indeed, the first degree murder conviction demonstrates the jury rejected Ponce's
11  characterization of the events. Even if the evidence might also have supported an inference that the
12  killing was not deliberate and premeditated, that does not preclude the contrary conclusion. It is the
13  duty of the jury to acquit a defendant if the evidence supports two separate interpretations of guilt
14  and innocence. *See People v. Perez*, 2 Cal. 4th 1117, 1124 (1992). If, however, "the circumstances
15  reasonably justify the trier of fact's findings, the opinion of the reviewing court that the
16  circumstances might also be reasonably reconciled with a contrary finding does not warrant a
17  reversal of the judgment." *Id.* Federal courts determine only whether "after viewing the evidence in
18  the light most favorable to the prosecution, *any* rational trier of fact could have found the essential
19  elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)
20  (emphasis in original). Ponce failed to show a reasonable jury could not have found the requisite
21  degree of premeditation and deliberation on the evidence presented at trial.

23  D. Admission of particular gang evidence
24  Ponce claims that the admission of evidence about the Norteño gang violated his fair trial
25  and due process rights. Ponce argues that the admission of CD lyrics and testimony about the
26  Nuestra Familia and Mexican Mafia were irrelevant to the disputed issues in the case, since his
27  counsel admitted his gang affiliation in opening arguments. The further evidence, Ponce contends,
28  "infused the trial with unfairness." The trial court disagreed, explaining that the lyrics from the CD

9

had probative value in that they demonstrated the general murderous intent of Norteño gang members. In affirming the trial court decision, the California Court of Appeal observed that the lyrics provided the jury with insight into Ponce's mental state and reasons as to why he would use a loaded gun on a perceived Sureño.

Federal habeas relief would be available only if the admission of the CD lyrics and the testimony regarding the Nuestra Familia and Mexican Mafia were such that it rendered Ponce's trial "so fundamentally unfair as to violate due process." *Windham v. Merkle*, 163 F.3d 1092, 1103 (1998). Here, Ponce's claims of a fundamentally unfair trial fall flat. First, testimony regarding the Nuestra Familia and the Mexican Mafia were relevant in that they provided a contextual historical background concerning the petitioner's criminal street gang and its rival counterpart. That background was relevant to the understanding of Ponce's alleged motive in killing a suspected rival gang member. Second, admission of CD lyrics containing specific reference to the killing of Sureños by Norteños provided further relevant insight into the contentious gang rivalry and Ponce's potential motivations. Accordingly, Ponce's right to a fair trial and due process were not violated by the admission of evidence regarding the Norteño gangs. *See United States v. Abel*, 469 U.S. 45, 49 (1984) (holding evidence regarding the "attributes" and "tenets" of a particular organization, as well as evidence of defendant's and witness's membership in the organization, to be relevant and admissible, where motivations in issue).

E. <u>Ineffective assistance of counsel</u>

Ponce contends that his constitutional right to effective assistance of counsel was violated when his trial attorney failed to object to the testimony regarding the Mexican Mafia and the Nuestra Familia. Ponce makes additional claims relating to counsel's failure to object to the prosecutor's characterization of him as a "gang banger," and use of analogies to Ku Klux Klan members and Neo-Nazi skinheads.

This Court's scrutiny of trial counsel's performance must be "highly deferential." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). To establish ineffective assistance of counsel, a petitioner must prove that trial counsel's performance fell below an objective standard of reasonableness. *Id.*

at 687. It is not enough merely to show deficient performance. *Id.* A petitioner must show that the deficient performance was such that it prejudiced the defense. *Id.* at 694. This requires establishing that but for trial counsel's deficient performance, the jury conviction would have been different. *Id.*

Here, Ponce has failed to meet the standard set forth in *Strickland*. First, Ponce has not shown that trial counsel's performance fell below an objective standard of reasonableness. Counsel must be given wide latitude in making tactical decisions. *Id.* at 689. Strategically, counsel may have refrained from objecting so as not to appear desperate or hyper-technical. *See United States v. Molina*, 934 F.2d 1440, 1448 (9th Cir. 1991) (stating that "[f]rom a strategic perspective . . . many trial lawyers refrain from objecting during closing arguments to all but the most egregious misstatements by opposing counsel on the theory that the jury may construe their objections to be a sign of desperation or hyper-technicality"). Such strategic choices do not rise to deficient performance that would support an ineffective assistance claim.

Even if such a deficient performance had been established, Ponce has not demonstrated prejudice. It cannot be said that trial counsel's failure to object would have resulted in a different result. As such, Ponce's rights were not violated.

## V. CONCLUSION

The state courts' adjudication of the claims did not result in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Accordingly, the petition is DENIED.

A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may seek a certificate of appealability from the Court of Appeals. The Clerk shall enter judgment in favor of respondents and close the file.

11

1  IT IS SO ORDERED.

2

3  Dated: 9/14/12

_____
RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE